### HICKORY SPECIALTIES, INC.

v.

### FOREST FLAVORS INT'L, INC. and Samuel D. Crace.

No. 2:97–0008.

United States District Court, M.D. Tennessee, Northeastern Division.

June 18, 1998.

Jay Scott Bowen, Timothy L. Warnock, Sarah W. Anderson, Bowen, Riley, Warnock & Jacobson, PLC, Nashville, TN, for Plaintiff.

Benjamin Cleveland Fordham, Craig Vernon Gabbert, Jr., David Alexander Fardon, Joseph Allen Kelly, Harwell, Howard, Hyne, Gabbert & Manner, Nashville, TN, for Defendants.

WISEMAN, Senior District Judge.

### MEMORANDUM

The Court previously dismissed the plaintiff's non-compete claims, finding as a matter of law that any non-compete obligations expired in 1992. *See* Mem. Op., Aug. 20, 1997 (Doc. 37, at 5–7, 7 n. 2, 11–12). The defendants now move for summary judgment on the four remaining claims: (1) Count II, Violation of Non–Disclosure Agreements; (2) Count III, Breach of Fiduciary Duty of Loyalty; (3) Count IV, Usurpation and Disclosure of Trade Secrets; and (4) Count V, Unfair Competition. The Court GRANTS the defendants' motion for summary judgment on Count V. The Court DENIES the defendants' motion for summary judgment on the three remaining counts, finding that a question of material fact exists as to whether an exception to the general rule of patent preemption should apply.

### I. Relevant Background

As explained in this Court's memorandum opinion dated August 20, 1997, (Doc. 37), Hickory Specialties, Inc. ["HSI"] produces liquid smoke, a by-product of the controlled

burning of wood that is used to flavor meat. HSI was founded in the early 1970's by the Crace brothers, R. Joseph and Don, each of whom owned fifty percent of the company stock. In 1982, Don Crace sold his stock in HSI to his brother, R. Joseph, for $4.2 million.

Defendant Sam Crace is Don Crace's son. He grew up working at HSI, and possessed enough knowledge of the liquid smoke process that HSI required him to sign both a ten year non-compete covenant and an agreement to never compete with HSI. Sam Crace quit working at HSI in 1989, and in 1994 he formed Forest Flavors, Inc. ["FFI"], a competing liquid-smoke business, and one of the defendants in this action.

On August 1, 1978, HSI and then-co-plaintiff Griffin Laboratories, Inc., brought suit in the Chancery Court for Cumberland County, Tennessee, for injunctive relief and damages alleging misappropriation and infringement of trade secrets against B & L Laboratories and former employee Charles Ledford. *See* Defs.' Notice of Filing (Doc. 19, ex. J, at 1–2). The Chancellor dismissed the case, but on July 6, 1979 the Tennessee Court of Appeals reversed, finding that HSI and Griffin's liquid smoke process was a trade secret. *Hickory Specialties, Inc. v. B & L Lab., Inc.,* 592 S.W.2d 583, 587 (Tenn.Ct.App.1979). The Court of Appeals ordered the chancellor to issue an injunction "enjoining the defendants ... from divulging or using any trade secrets of plaintiffs relating to the manufacture or manufacturing process, distribution or sale of liquid smoke ..." *Id.* at 588.

On November 1, 1979 and before the chancellor had responded to the mandate above, HSI applied for a temporary restraining order. *See* HSI's Mem. in Supp. of App. for TRO, Nov. 1, 1979 (Doc. 60, ex. 2, at 4). Due to a procedural shuffle, HSI filed its petition for a TRO in the Tennessee Supreme Court.[1] HSI's petition for a TRO asserted that Mr. Ledford's sale, production, manufacture, advertising, and distribution of liquid smoke was imminent. *Id.* HSI may have asserted also that Mr. Ledford disclosed HSI's trade secrets. *See* Aff. of R. Joseph Crace, filed in Supp. of 1979 TRO (Doc. 60, ex. 3).[2] The Tennessee Supreme Court granted the 1979 TRO for fear that HSI might suffer irreparable harm if the Court refused to grant it. *See Hickory Specialties, Inc. v. B & L Labs., Inc.,* No. 4228, slip op. (Tenn. Nov. 8, 1979) (Doc. 28, ex. 2). The TRO enjoined Mr. Ledford and B & L from divulging or using any trade secrets of HSI. *Id.*

On February 11, 1980, the chancellor responded to the mandate from the Tennessee Court of Appeals, and issued a permanent injunction against Ledford and B & L. *Hickory Specialties, Inc. v. B & L Labs., Inc.,* No. 4228, slip op. (Ch. Cumberland County Feb. 11, 1980) (doc. 28, ex. 4). Among other instructions, the injunction "permanently enjoined [the defendants] from divulging or using any trade secrets of [the plaintiffs]." *Id.*

On some date between February 11 and April 3, 1980[3], HSI asked the Chancery

1. According to HSI, the chancery court and the court of appeals lacked jurisdiction when HSI sought permission to appeal the court of appeals' decision. Because the court of appeals had not issued an enforceable order yet, HSI's only option was to seek relief in the Tennessee Supreme Court.

2. In its present pleadings, HSI claims that it never asserted in 1979 that Mr. Ledford had disclosed HSI trade secrets. HSI's 1998 Mem. in Resp. to Defs'. M. for Sum. J. (doc. 63, at 3). However, according to defendants FFI and Sam Crace, R. Joseph Crace's 1979 affidavit indicates that HSI *did* assert in 1979 that Mr. Ledford had disclosed HSI trade secrets. In the seventh paragraph of his affidavit, R. Joseph Crace states that if Baltimore Spice representatives came to B & L Laboratories to "observe the manufacturing process and to offer technical assistance," the trade secrets of HSI would be revealed and their value would be "diminished beyond calculation." *Id.* at ¶ 7. What HSI fails to point out, but what FFI catches, is that R. Joseph Crace stated in the third paragraph of that same affidavit that Baltimore Spice representatives *did* recently visit the S & L Laboratories to offer technical assistance. *Id.* at ¶ 3. Reading paragraphs seven and three together, one could conclude that HSI's trade secrets were rendered valueless when the Baltimore Spice representatives came to offer technical assistance at B & L Labs, contrary to the assertion of HSI in its pleadings before this Court.

3. HSI's petition for contempt is undated, except to show that the year was 1980. We know, however, that HSI must have filed its petition prior to April 3, 1980 since that is the day the chancellor issued his order on that matter.

Court for Cumberland County to hold Mr. Ledford and B & L in contempt of the permanent injunction. *See* HSI's Pet. for Civ. Contempt (___, 1980) (Doc. 60, ex. 6). In that petition, HSI alleged that Mr. Ledford and B & L had violated the injunction entered by the Tennessee Court of Appeals by using HSI's trade secrets. *See id.* at ¶¶ 7–8. Specifically, HSI alleged that Ledford and B & L were using HSI's trade secrets to make liquid smoke and then selling that liquid smoke at a lower price then HSI so that customers were refusing to purchase HSI's liquid smoke. *See id.* at ¶ 10. Although the crux of HSI's petition focused on the illegal use of its trade secrets, HSI also asserted generally that Ledford was in the process of divulging its trade secrets: "[I]t is imperative that an immediate hearing be held, as to the amount of damages Plaintiffs are entitled, as each day that Plaintiffs' trade secrets are divulged and used dilutes their value." *Id.* at ¶ 17.

The chancellor held Mr. Ledford and B & L in contempt of the permanent injunction. *Hickory Specialties, Inc. v. B & L Labs., Inc.*, No. 4228, slip op. at 1–2 (Ch. Cumberland County, Apr. 3, 1980) (Doc. 60, ex. 7). The chancellor focused primarily on the defendants' illegal use of the trade secret, and ordered them to cease manufacturing liquid smoke and to destroy any equipment similar to HSI's that the defendants used to make liquid smoke. Nowhere in his order did the chancellor make specific findings that the defendants divulged HSI's trade secrets. Nevertheless, the chancellor ordered the clerk and master, "to assess the amount of damages to which Plaintiffs are entitled for the divulging by the Defendants of their trade secrets." *Id.* at 1–2.

Pursuant to the chancellor's direction, the clerk and master determined the fair market value of HSI's and then-co-plaintiff Griffith's trade secrets to be $2,751,000. *Hickory Specialties, Inc. v. B & L Labs., Inc.*, No. 4228, slip op. (Clerk and Master, Cumberland County Sept. 5, 1980) (doc. 60, ex. 8). However, he found that HSI and Griffith showed no damages "in the nature of lost profit or loss of business," and awarded zero damages. *Id.*

HSI objected to the clerk and master's report, and urged the chancellor to award it $2,751,000 in damages. *See* HSI's Obj. to Master's Rep., Sept. 9, 1980 (Doc. 28, ex. 9). HSI stated that, "[p]laintiffs submit that the correct measure of damages in this cause for wrongful divulging by the Defendants of Plaintiffs' trade secrets is the fair market value of those trade secrets...." *Id.* at 2.

Before the chancellor ruled on the objections to the clerk and master's report, HSI and Ledford entered into settlement agreements. Ledford admitted that he had divulged trade secrets of HSI to B & L, Jay Olson, and Glen Fisher—who were apparently employees at B & L. *See* Settlement Agreement of Sept. 29, 1981 (doc. 60, ex. 9). But, as FFI points out, Ledford's settlement agreement admitted that he had disclosed the secrets to other unnamed people besides Olson, Fisher, and B & L. He stated:

> Ledford has knowingly used and divulged, among other things, the following information that he now recognizes to constitute the trade secrets of [HSI] and that he recognizes to be confidential and proprietary to it, to, *among others*, B & L ..., Jay Olson and Glen Fisher.

*Id.* (emphasis added). Also in that agreement, Ledford promised to never divulge HSI's trade secrets to anyone again. *Id.*

Eventually, the chancellor reviewed the parties' objections to the clerk and master's report and found that the plaintiffs should have been awarded damages in the amount of the fair market value of their trade secrets. *See Hickory Specialties, Inc. v. B & L Labs., Inc.*, No. 4228, slip. op at 1–2 (Ch. Cumberland County June 6, 1983) (doc. 28, ex. 11). The chancellor wrote that, "The Master was directed 'to assess the measure of damages to which the plaintiffs (plaintiff now) are entitled for divulging by the defendants of their trade secrets.['] What the master was to determine differs from what he did determine." *Id.* at 1.

On November 3, 1981, the United States Patent Office granted Mr. Ledford a patent for liquid smoke. (Doc. 28, ex. 13.) He filed his application for a patent on May 8, 1980, and assigned the patent to The Baltimore

Spice Company. *Id.* HSI thereafter purchased the patent from Baltimore Spice. *See* Aff. of R. Joseph Crace (doc. 26, ¶ 2).

In 1986, R. Joseph Crace retired from HSI. *Id.* at ¶ 1. Until then, he served as either the president and CEO or the chairman of the board since HSI's founding. *Id.*

On January 29, 1997, HSI filed a complaint in this Court naming Sam Crace and FFI as defendants. (Doc. 1.) The complaint listed six separate counts: (1) breach of a covenant not to compete; (2) breach of a non-disclosure agreement; (3) breach of fiduciary duty; (4) trade secret violations; (5) unfair competition; and (6) misrepresentation and promissory fraud. The defendants answered and counterclaimed on February 24, 1997, alleging that HSI had violated 15 U.S.C. §§ 1–2, and asserting damages under 15 U.S.C. § 15. (Doc. 5.) The plaintiff answered the counterclaim on March 17, 1997, at which point HSI demanded a jury. (Doc. 11.)

On August 20, 1997, this Court granted in part the defendants' motion for summary judgment, dismissing the first and sixth claims (both regarding non-compete agreements), and finding as a matter of law that any non-compete obligations expired in 1992. *See* Mem. Op., Aug. 20, 1997, at 5–7, 7 n. 2, 11–12. The defendants had argued that summary judgment was appropriate on the trade secret claims based on two theories. First, the defendants argued that the plaintiffs waived or lost their trade secret on liquid smoke because the records to the *B & L* case were not sealed. The Court denied the motion on that theory, finding that questions of material fact existed as to whether the records were easily ascertainable. Second, the defendants argued that the fact the plaintiff's liquid smoke is patented (the "Ledford" patent) preempts it from protection as a trade secret. The Court found that misappropriation of trade secrets is governed by state law, and that a question of material fact existed as to whether the Ledford patent is a product or a process patent.

The defendants now move for summary judgment on grounds of judicial estoppel and, again, patent preemption—this time citing new authority.

## II. Law and Analysis

### A. Summary Judgment

Summary judgment is appropriate only when there is no genuine issue of material fact and when the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476–80 (6th Cir.1989). The party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. In responding to a motion for summary judgment, the nonmoving party cannot rest on its pleadings, but must present some "specific facts showing that there is a genuine issue for trial." *Id.*

The Supreme Court concluded in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), that a dispute about a material fact is "genuine" within the meaning of Rule 56 of the Federal Rules of Civil Procedure only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505 "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Id.* at 252, 106 S.Ct. 2505. Of course, the Court is to construe the evidence and all inferences to be drawn from it in the light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. 2505.

### B. All Four Remaining Claims are Properly Classified as One Trade Secret Claim

According to the defendants, HSI's complaint shows that HSI's "allegations that defendants have stolen Hickory's trade secrets are at the very heart of each of Hickory's remaining claims." *See* Defs.' Reply Mem. (Doc. 66, at 9). The plaintiffs disagree. *See* Pl.'s Resp. Mem. (Doc. 63, at 12). HSI's four remaining counts are predicated on finding parts of HSI's liquid smoke are viable trade secrets. Therefore, unless HSI can prove that parts of its liquid smoke qualify for trade secret protection, the four remaining counts will fail.

### 1. Count II (violation of non-disclosure agreement)

In its complaint, HSI stated that:

Defendant Sam Crace has breached the Non–Disclosure Agreements into which he entered *by disclosing Hickory Specialties' confidential information* to Defendant Forest Flavors *and otherwise.*

These breaches and threatened breaches *have harmed* and threaten further and irreparable harm to Hickory Specialties. These defendants have stated that they may use the same processes and techniques which Hickory Specialties employs, as well as other information belonging to Hickory Specialties which they have contractually agreed not to do.

*The use and disclosure of Hickory Specialties' confidential information and know-how,* in violation of the several contractual agreements that he [defendant] would not do so, *will result in damages to Plaintiff.*

*See* Compl. (Doc. 1, at ¶¶ 24–26) (emphasis added). The language of Count II shows HSI must succeed on its argument that its information is a protectable trade secret in order to succeed in arguing that the defendants violated its non-disclosure agreements. The heart of paragraphs 24–26 hinge on proving that the defendants divulged the plaintiff's trade secrets. As the defendants assert, without a valid trade secret to disclose, there is no way for the defendants to have violated a non-disclosure agreement. *See* Defs.' Reply Mem. (Doc. 66, at 9).

### 2. Count III (breach of fiduciary duty of loyalty)

In its complaint, HSI stated that:

While he was an employee of [HSI] and its agent, and solely because of that relationship, [HSI] disclosed to [defendant] Sam Crace, and he was given access to, all of its trade secrets, confidential information, confidential manufacturing techniques, processes and formulae. In addition, he learned of the equipment necessary to manufacture liquid smoke and was involved in the refinement and improvement of the equipment and the manufacturing techniques.

He learned the identity of customers, suppliers, and all relevant pricing information, as well as the costs of manufacture.

Because Sam Crace gained access to, assisted in the development of, and learned this information during his employment at [HIS] and because of his agency relationship with it, he is imbued with a fiduciary duty of loyalty to [HSI] and is *bound not to use or disclose that information or otherwise use it or take advantage of it to the detriment of [HIS].* This information is an asset of [HSI] which it is entitled to protect from wrongful use or disclosure by Sam Crace.

*If the information is used or disclosed as the Defendant has threatened, [HIS] is damaged irreparably.* It is entitled to injunctive relief.

*See* Compl. (Doc. 1, at ¶¶ 28–30) (emphasis added). Again, the defendants assert that it is impossible to violate a duty of loyalty when one imparts information that has already been disclosed, as established in the Chancellor's 1980 findings. *See* Defs.' Reply Mem. (Doc. 66, at 9). Additionally, the defendants refer the Court to a Tennessee Court of Appeals decision which found that former employees do not violate any "duty of loyalty" by competing with former employers, absent a non-compete covenant, even when the employees learned allegedly "confidential" information in their prior jobs. *See id.* (citing *Data Processing Equipment Corp. v. Martin,* No. 87–230–II, 1987 WL 30155, slip op. at *6 (Tenn.Ct.App. Dec. 30, 1987)). The Court already found that the plaintiff's non-compete covenants were invalid. *See* Mem. Op., Aug. 20, 1997 (Doc. 37, at 6–7). This authority is persuasive, and lends support to the conclusion that the defendants could not have violated a duty of loyalty if there were no trade secrets to protect. The Court finds that Count III, like Count II, will fail if the plaintiff cannot prove it deserves trade secret protection.

### 3. Count IV (usurpation and disclosure of trade secrets)

In its complaint, HSI states:

*[HIS] is the owner of several trade secrets. In 1979, the Tennessee Court of Appeals adjudicated many of [HSI's] manufacturing processes, techniques and equipment to be trade secrets. That ruling operates as collateral estoppel upon these Defendants.*

Although stating that he will use new technology to manufacture liquid smoke, ... Defendants Sam Crace and Forest Flavors, on information and belief, intend to use many of the processes, formulae, manufacturing techniques and equipment which have been found to be trade secrets of [HSI]. Moreover, they surreptitiously ordered equipment and materials in an effort to avoid detection by Plaintiff of their plans, operations and activities to enter the liquid smoke business and use and divulge [HSI]'s trade secrets.

*The Defendants learned of [HSI]'s trade secrets only through Defendant Crace's employment at [HSI] and the wrongful disclosure by Sam Crace to Defendant Forest Flavors. These Defendants are not entitled to use or disclose them.*

*See* Compl. (Doc. 1, at ¶¶ 31–33) (emphasis added). As with Counts II and III, Count IV of the plaintiff's complaint is not actionable unless the Court finds that HSI's information qualifies as a trade secret. *See Arco Indus. Corp. v. Chemcast,* 633 F.2d 435, 441–43 (6th Cir.1980) (reversing the district court's ruling that the defendants misappropriated the plaintiff's trade secret where none of the plaintiff's information could be labeled as a trade secret).

### 4. Count V (Unfair Competition)

In its complaint, HSI states:

The Defendants' *breaches of their duties of loyalty, breaches of the contractual and common law non-disclosure obligation and the wrongful use of [HSI]'s manufacturing techniques,* know-how, knowledge, and equipment, as well as their customer

information, pricing information and other confidential information constitutes unfair competition. In addition, the Defendants have surreptitiously ordered material and supplies *in an effort to keep their plans to compete unfairly with [HSI]'s secret.*

*See* Compl. (Doc. 1, at ¶¶ 35). Although neither party has referred to it, the Sixth Circuit's opinion in *Sovereign Order of Saint John of Jerusalem, Inc. v. Grady,* 119 F.3d 1236, 1243 (6th Cir.1997), gives the Court no option but to rule against the plaintiff on Count V.[4] In *Grady,* the Sixth Circuit explained that the tort of unfair competition is composed of three elements under Tennessee law, focusing on the action of "passing off"[5] a product. *Id.*

Although Tennessee law regarding unfair competition is not well-developed, it appears that there are three elements to this tort. A plaintiff must prove that: (1) the defendant engaged in conduct which "passed off" its organization or services as that of the plaintiff; (2) in engaging in such conduct, the defendant acted with an intent to deceive the public as to the source of services offered or authority of its organization; and (3) the public was actually confused or deceived as to the source of the services offered or authority of its organization.

*Id.* The plaintiff in the instant case bases its claim for unfair competition on the three grounds listed as Counts II, III, and IV:(1) breach of the duty of loyalty; (2) breach of non-disclosure obligations; (3) and misappropriation/ disclosure of trade secrets. Because the plaintiff has not alleged that the defendants "passed off" the defendants' liquid smoke as that of the plaintiff, the Court GRANTS summary judgment to the defendants on Count V, based on this rationale alone. *Id.*

Because the Court GRANTS the defendants motion for summary judgment as to

---

**4.** Both the case cited by the plaintiff, *Johns–Manville Corp. v. Guardian Indus. Corp.,* 586 F.Supp. 1034, 1041 (E.D.Mich.1983), and the case cited by the defendants, *Arco Indus. Corp. v. Chemcast,* 633 F.2d 435, 441–43 (6th Cir.1980), rely on Michigan law rather than Tennessee law and are therefore merely persuasive.

**5.** The term "passing off" is synonymous with "palming off." Both refer to "false representation tending to induce buyers to believe that the defendant's product is that of the plaintiff...." *See* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 130, at 1015 (5th ed.1984).

the plaintiff's Count V, only three of the plaintiff's claims now remain. In sum, all three of plaintiff's remaining claims depend on a conclusion that HSI's information qualifies as a trade secret.

## C. Patent Preemption

An application for a patent requires disclosure in exchange for the exclusive right to use the patented invention for a given term. *See Scharmer v. Carrollton Mfg. Co.*, 525 F.2d 95, 99 (6th Cir.1975). An application for a patent must:

> contain a written description of the invention, and of the manner and process of making and using it, *in such full, clear, concise, and exact terms as to enable any person* skilled in the art to which it pertains, or with which it is most nearly connected, *to make and use the same, and [must] set forth the best mode contemplated by the inventor of carrying out his inventions.*

35 U.S.C.A. § 112 (1984) (emphasis added).

█ It is generally accepted that once information is patented, it can no longer be a trade secret. "[W]hether secrecy is lost through seepage in conduct of business, sale or exposition of a product embodying the secret, disclosure of the idea through a trade or technical publication, *or by way of patent* ... the principle remains: a secret on the wing cannot be recalled." 1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 1.03, at 1–98 (1997). "In general, both a patent and a trade secret in the same subject matter cannot coexist.... When an inventor decides that [information] is patentable, disclosure of that [information] in a patent immediately voids any trade secrets in it." Robert C. Scheinfeld & Gary M. Butter, *Using Trade Secret Law to Protect Computer Software*, 17 Rutgers Computer & Tech L.J. 381, 399 (1991). "[P]atent and trade secret protection are typically mutually exclusive." *Id.* at 408. "A manufacturer who has developed a process which is potentially a trade secret must ... choose whether he will protect his process through trade secrecy or through patent law." George J. Alexander, *Commercial Torts* § 3.1, at 90 (2d ed.1988). "[I]nformation that may have been subject to trade secret protection prior to the patent grant is actually deemed disclosed to the extent that it is described in the patent." *Id.*, at 100.

The rule in the Sixth Circuit is that, "[i]f a trade secret is patented there is no further right to secrecy. The patent is a legal disclosure with the right to a limited, temporary monopoly granted as the reward for disclosure." *Scharmer*, 525 F.2d at 99 (finding that "[w]hen the patent was granted, [the plaintiff]'s property right in the trade secret ceased prospectively. Thus, he had no right of action for misuse of a trade secret subsequent to that date."). In establishing this rule for our circuit, the Sixth Circuit looked to other circuits rather than to law from a specific state. Nevertheless, caselaw from Tennessee courts implies the same result.[6]

In *Hickory Specialties, Inc. v. B & L Lab., Inc.*, 592 S.W.2d 583, 587 (Tenn.Ct.App.1979), the Court of Appeals held that, "[t]he subject matter of a trade secret must be secret. Matters of public knowledge or general knowledge in the industry or ideas which are well known or easily ascertainable, cannot be trade secrets." *Id.*, *cited in Heyer–Jordan & Assocs. v. Jordan*, 801 S.W.2d 814, 821 (Tenn.Ct.App.1990). Since the *B & L* Court was not faced with the question before this Court, it does not state explicitly that patent protection preempts trade secret protection. However, patented information fits the definition from *B & L* of what constitutes a non-trade secret: by their essence patents describe information which is both a "matter[ ] of public knowledge" and "easily ascertain-

---

6. In the Court's August, 1997 Memorandum Opinion, (doc. 37), the Court denied the defendants' motion for summary judgment. The defendants based their motion in part on the theory of patent preemption. At that point, the Court found that a question of material fact existed as to whether HSI's patent was a product patent or a process patent. As authority on that point, the Court cited *Arco Indus. Corp. v. Chemcast Corp.*, 633 F.2d 435, 443 (6th Cir.1980). *Arco* was an appeal from a federal district court sitting in Michigan, applying Michigan law. Upon further examination, the Court finds that *Arco* is not controlling in the instant case on the issue of patent preemption. No other Sixth Circuit case analyzes this issue (process versus product patent) and, more importantly, nor does any Tennessee court. Additionally, neither party in the instant suit has raised the issue of the product/process patent difference.

able." E.g., id.; see e.g., 35 U.S.C.A. § 112 (requiring patent applicants to fully describe the information so that members of the public can create the same process or product).

■ When Mr. Ledford patented HSI's liquid smoke process in 1981, he divulged the trade secrets that HSI possessed regarding liquid smoke at that point in time. See Depo. of R.J. Crace (Doc. 18, ex. A, at 87–90). HSI now owns the "Ledford patent." See id. at 88–90. In a deposition taken on March 26, 1997, R. Joseph Crace testified for HSI as a Rule 30(b)(6) designee. He stated:

Q: And he [Ledford] basically patented the Hickory process.

A: Right.

Q: And these parameters you're talking about, the temperatures, the sawdust, the process without forced air, he tried—he [Ledford] actually did put all those in the patent, didn't he?

A: Yes.

   .    .    .    .    .

Q: [Y]ou would agree with me that [the Ledford] patent itself talks about— which [HSI], you said owns now, that patent talks about, basically the [HSI] process.

A: Yes.

Id. at 88–90. Later in the same deposition, R. Joseph Crace identified a document from HSI's files, dated July 6, 1987. See Doc. 18, ex. A, att. 6. The defendants' attorney asked R. JOSEPH Crace about the document:

Q: [The July 6, 1987 document] says that the product and the process that's described in the Ledford patent are virtually identical to those used by [HSI]. You would agree that says that.

A: Yes.

Q: You would agree with that statement.

A: Yes.

Q: And then it goes on and lists 12 areas of particulars.

A: Yes.

Id. at 100–01. These admissions by HSI's Rule 30(b)(6) witness indicate that HSI disclosed the trade secrets surrounding its liquid smoke when it patented its liquid smoke.

The Court finds that under the general rule of patent preemption, HSI would be preempted from arguing now that its process is still a valuable secret. However, as discussed below, this Court believes that an exception to the general rule exists when a party subsequently refines its patented information/technology. Because a question of material fact exists as to whether HSI's trade secrets are refinements—or mere clarifications—of the patent, the Court must DENY summary judgment on the three remaining counts.

HSI argues that the Court should apply an exception to the general patent preemption rule. HSI argued in its pleadings and at the hearing on the instant motion that the facts of this case are similar to those of *Johns–Manville Corp. v. Guardian Indus. Corp.* 586 F.Supp. 1034 (E.D.Mich.1983), in that the information in the patent is merely the "tip of the iceberg," and that the trade secrets lurk underneath that tip. In *Johns–Manville*, the plaintiff brought suit against the defendant corporation and defendant former employees for patent infringement, misappropriation of trade secrets, and violation of employment fiduciary duty. As discussed below, the *Johns–Manville* Court held that the plaintiff could own a patent on certain information, and simultaneously receive trade secret protection for refinements made to that same information. HSI cites *Johns–Manville* as authority for the proposition that a party can obtain patent protection and trade secret protection simultaneously. Impliedly, HSI asserts that *Johns–Manville* gives this Court permission to find that the refinements to HSI's liquid smoke deserve trade secret protection even though HSI's liquid smoke is already patented.

In *Johns–Manville*, the District Court in Michigan found that the defendants both infringed the patent and misappropriated trade secrets. *Id.* at 1042, 1076. Although the *Johns–Manville* Court published the conclusion of its opinion, it placed much of its analysis under seal. See *Id.* at 1048 (removing pages 28–35 of its opinion discussing the development of the plaintiff's trade secrets); 1072 (removing pages 114–127 of the opinion discussing the propriety of enjoining the defendants from misappropriating the trade se-

crets). The plaintiff in *Johns–Manville* asserted that the defendants misappropriated nine alleged trade secrets. *Id.* at 1069. The court found that four items were protected as trade secrets, while five items were not. *Id.* at 1076.[7]

Nowhere in the published parts of the *Johns–Manville* opinion does the court discuss how it came to the conclusion that information can be protected simultaneously as a patent and as a trade secret. Nowhere does it discuss whether a patent precludes trade secret protection when a patent, by its nature, discloses the secret. Nowhere does it discuss HSI's theory that improvements to patents can receive trade mark protection, although it does acknowledge that disclosure of the secret renders information unprotectable as a trade secret. *Id.* at 1071–73.

As to the issue of disclosure/non-disclosure, the *Johns–Manville* Court raised only the following points. First, the court addressed the plaintiff's maintenance of tight security around the plant where the plaintiff developed the technology, and plaintiff's policies regarding secrecy. *Id.* at 1071–72. Next, the court addressed the publication of a book by employees of the defendant (who used to be employees of the plaintiff) which contained only general descriptions of the technology. *Id.* at 1072. Finally, the court addressed the rule in Michigan that information must not be readily ascertainable to the general public without hardship or difficulty, *Id.* at 1073, similar to the rule in Tennessee. For authority on that rule, the court cited *Hayes–Albion Corp. v. Kuberski*, 108 Mich. App. 642, 311 N.W.2d 122 (1981). *Kuberski* is completely irrelevant to the instant case since the plaintiffs in that case chose to not patent their technology. *Hayes–Albion*

*Corp. v. Kuberski*, 421 Mich. 170, 364 N.W.2d 609, 612 (1984) (affirming in part and reversing in part). In that regard, the *Kuberski* court could not have been confronted with the issue of patent preemption. Also, in discussing *Kuberski*, the *Johns–Manville* court never mentioned the concept of patent preemption. 586 F.Supp. at 1073. Finally, the *Johns–Manville* court focused its attention on the difference between product·and process patents, *id.*, which appears to be a debate that varies from state to state. As discussed above, although Michigan law differentiates between product and process patents, this Court has been unable to find any case in Tennessee that addresses the issue.

This Court finds that it cannot rely on *Johns–Manville* to preclude it from finding patent preemption, even though the *Johns–Manville* Court apparently reached the opposite result. Unfortunately, the *Johns–Manville* opinion neither discusses any of that court's thinking on this issue, nor does it cite any authority for its conclusion, at least in the published parts of its opinion.

Nevertheless, it is possible that the Sixth Circuit has contemplated the possibility of an exception to the general rule of patent preemption where a party refines information or technology which the party has previously patented. In dicta, the Sixth Circuit stated that, "Certainly it is possible that a new combination of known steps or processes can be entitled to trade secret protection." *Arco Indus. Corp. v. Chemcast Corp.*, 633 F.2d 435, 442 (6th Cir.1980) (reversing a finding of trade secret misappropriation and patent infringement on grounds separate from the refinement exception). This Court holds that post-patent refinements qualify for trade secret protection as an exception to the

---

7. In concluding that the defendants infringed the plaintiff's patent, the *Johns–Manville* Court noted the infringement of two specific parts of the technology: the Heated Spinner Ambient, and the Air Ring. 586 F.Supp. at 1067–69. (As to the heated spinner ambient, the court found that while a certain element of the spinner was an improvement to the patent, the defendants "ignored the file wrapper history, and read J–M's claims too narrowly." *Id.* at 1067. Neither party in the instant case has raised the issue of file wrapper estoppel.)

The *Johns–Manville* Court then addressed the trade secret issues, and noted the nine trade secrets that the plaintiff claimed the defendants misappropriated. *Id.* at 1069. The Court sealed part of its discussion on this issue, *see id.* at 1073 (sealing pages 114–27 of the opinion), and then concluded that the defendants had misappropriated the Air Ring (along with three other trade secrets), while also concluding that the defendants had not misappropriated the Heated Spinner Ambient. *Id.* at 1076. Therefore, it is unclear how the *Johns–Manville* Court reached this conclusion.

general patent preemption rule. In the instant case, a question of material fact exists as to whether this refinement exception should, or should not, apply.

Evidence in the record indicates that HSI's patent on liquid smoke reveals material which would preclude HSI from receiving trade secret protection, due to the general patent preemption rule. As discussed above, R. Joseph Crace acknowledged in a deposition that the product and process that are described in the Ledford patent are virtually identical to those used by HSI. *See* Depo. of R. Joseph Crace (Doc. 18, ex. A, at 87–90, 100–01). This evidence implies that presently HSI merely may be clarifying information found in the patent and labeling it a trade secret. Unlike post-patent refinements, clarification of a patent would not be new information subject to trade · secret protection. Since applications for patents must set forth the "full, clear, concise, and exact terms as to enable any person skilled in the art .. to make and use the same, and'must set forth the best mode contemplated by the inventor of carrying out his inventions," 35 U.S.C.A. § 112 (1984), clarifications would set forth only what was already required to be disclosed when the patent was sought. While HSI may argue that the Ledford patent is invalid for failing to fully disclose information necessary for others to make the same liquid smoke as HSI, this argument has no bearing on the fact that mere clarification of the patent's contents would be preempted. *See Scharmer v. Carrollton Mfg. Co.*, 525 F.2d 95, 99 (6th Cir.1975) ("The fact that the patent was subsequently declared invalid negates only the inventor's right to a limited monopoly and not the public disclosure which attends issuance of the patent.").

The record also contains evidence to the contrary, indicating that HSI may have made refinements to its patent. For instance, on June 16, 1986 Sam Crace sent a letter to Joe Crace identifying several pieces of information and technology that HSI may have been interested in patenting. (Doc. 60, ex. 17.) Since the Ledford patent was issued in 1981,

this letter from 1986 indicates that HSI identified steps which may be post-patent refinements to its liquid smoke. *E.g., Arco*, 633 F.2d at 442. It is unclear whether these steps are mere clarifications of the patent that should have been disclosed at the time the patent was sought, or whether these steps are refinements that HSI made subsequent to issuance of the patent.

Because a genuine issue of material fact exists as to whether HSI's information qualifies for trade secret protection through the patent preemption refinement exception, the Court cannot grant summary judgment on the plaintiff's three remaining claims.

### D. Submission of Evidence After the Close of Discovery

HSI seeks to introduce a late-filed list of 36 newly identified trade secrets through its expert witness, Byron D. Taylor, (doc. 61), when it originally submitted a list of only 31 trade secrets in its response to interrogatories in February, 1997. (Doc. 18, ex. F, no. 1). HSI filed Byron Taylor's affidavit three days after the close of discovery.[8] HSI attempts to introduce this post-discovery filing by classifying it as a supplementation pursuant to Local Rule 9(a)(3) and Rule 26(e) of the Federal Rules of Civil Procedure.

The defendants direct the Court to two highly persuasive decisions from neighboring courts. First, according to *Haun v. Humana, Inc.*, 651 F.Supp. 120, 122 (W.D.Ky.1986), "[M]atters inconsistent with admissions conclusively established under Rule 36 cannot be considered by the Court in ruling upon Defendant's Motion for Summary Judgment." According to *Haun*, the Court should not allow HSI to file a post-discovery affidavit that is inconsistent with HSI's 14 month old interrogatory answer. Second, *Minnkota Power Cooperative, Inc. v. Manitowoc Co., Inc.*, 669 F.2d 525, 528–29 (8th Cir.1982), explains how it is proper for a court to exclude a party's expert testimony where the party possessed information to answer the. expert interrogatory long before discovery closed, and yet failed to do so. Based on these principles, the Court finds that the

---

8. Discovery closed on April 10, 1998 (per the Court's Order of January 6, 1998), except that, at HSI's request, the defendants agreed to extend the date for any expert deposition and agreed to a future supplemental deposition of Sam Crace. *See* Mar. 27, 1998 Agreed Order (doc. 59).

plaintiff is estopped from introducing contradictory post-discovery proof in the form of Byron Taylor's April 13, 1998 affidavit.

### E. Judicial Estoppel

■ Judicial estoppel forbids a party from taking a position "inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding." *Griffith v. Wal–Mart Stores, Inc.,* 135· F.3d 376, 380 (6th Cir.1998) (quotations and citations omitted); *see also Warda v. C.I.R.,* 15 F.3d 533, 538–39 (6th Cir.), *cert. denied,* 513 U.S. 808, 115 S.Ct. 55, 130 L.Ed.2d 14 (1994) (taxpayer who inherited land as a result of state court decree adopting her position that will was invalid may not avoid paying tax by claiming in later case that she was not entitled to inherit land). The purpose of judicial estoppel is to "preserve the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposing to suit an exigency of the moment." *Id.*

> Ambitious or greedy litigants who have discovered the financial rewards of successful litigation may not be satisfied with a single victory. Instead, they may try to maximize their financial and nonfinancial successes by litigating a case as many times as possible, sometimes flagrantly reversing earlier positions.... The doctrine [of judicial estoppel] empowers courts to preserve the sanctity of litigants' oaths, to avoid inconsistent judgments, to constrain litigants' manipulations of the judicial process, and to conserve judicial resources by throwing out inconsistent claims.

Ashley S. Deeks, Comment; *Raising the Cost of Lying: Rethinking Erie for Judicial Estoppel,* 64 U.Chi.L.Rev. 873, 873, 885 (1997) (urging federal courts sitting in diversity to apply the most aggressive version of judicial estoppel available to it between federal and state law, and noting that the Sixth Circuit applies its own version of judicial estoppel). Further, "[w]hen a litigant asserts a position in federal court that is inconsistent with one she took in state court, she puts at risk the integrity of both the federal and the state courts." *Id.* at 888.

The doctrine of judicial estoppel raises questions of whether it is best classified as substantive or procedural and, hence, whether a federal court sitting in diversity should apply state or federal law. *See id.* at 884. Without addressing the nature of the doctrine—whether it is a substantive or a procedural doctrine—the Sixth Circuit has determined that the doctrine raises primarily federal interests, and that federal law should therefore control. *See Edwards v. Aetna Life Ins., Co.,* 690 F.2d 595, 598 n. 4 (6th Cir.1982) (noting that "federal courts must be free to develop principles that most adequately serve their institutional interests").

■ The Sixth Circuit has identified three burdens which a party must meet to show that its opponent should be judicially estopped: (1) that the opponent took a contrary position; (2) that the contrary position was under oath in a prior proceeding; and (3) that the prior position was accepted by the court. *See Griffith,* 135 F.3d at 380.

■ In the instant case, the third requirement of *Griffith* is not met. First, and most importantly, the chancellor issued a permanent injunction at the direction of the Tennessee Court of Appeals which permanently enjoined Mr. Ledford and B & L from divulging or using any trade secrets of HSI. *Hickory Specialties, Inc. v. B & L Labs., Inc.,* No. 4228, slip op. (Ch. Cumberland County Feb. 11, 1980) (doc. 28, ex. 4). Presumably, that injunction is still in force. When the chancellor later held Mr. Ledford and B & L in contempt of the permanent injunction, *Hickory Specialties, Inc. v. B & L Labs., Inc.,* No. 4228, slip op. at 1–2 (Ch. Cumberland County Apr. 3, 1980) (doc. 28, ex. 6) (focusing primarily on the illegal use of HSI's trade secrets), he demonstrated that the injunction was still in force. When the chancellor ordered Mr. Ledford and B & L to pay HSI over two million dollars in damages, he did not find that HSI's trade secrets were rendered valueless. *Hickory Specialties, Inc. v. B & L Labs., Inc.,* No. 4228, slip op. at 1–2 (Ch. Cumberland County June 6, 1983) (doc. 28, ex. 11). Finally, Mr. Ledford promised in a settlement agreement with HSI that he never would divulge HSI's trade

secrets to anyone again. *See* Settlement Agreement of Sept. 29, 1981 (doc. 60, ex. 9).

Even if HSI asserted (1) that Mr. Ledford and B & L divulged HSI's trade secrets, (2) that HSI's trade secrets were rendered valueless, and (3) that judgment for the full value of the trade secrets was rendered, and even if that position is contrary to the position taken in the instant litigation—that HSI's liquid smoke is still a secret and has value—the instant defendants have failed to show that any previous court accepted the position that HSI's trade secrets were divulged to the point that HSI's liquid smoke no longer contained any trade secrets. Because a permanent injunction remains in effect, the defendants cannot overcome the third requirement of *Griffith.* Therefore, the Court refuses to grant summary judgment on the grounds of judicial estoppel.

### III. Conclusion

For the foregoing reasons, the Court DENIES the defendants' motion for summary judgment.

An appropriate order will enter.

### ORDER

For the reasons stated in the accompanying memorandum, the Court GRANTS the defendants' motion for summary judgment on Count V, and DENIES the defendants' motion for summary judgment on the three remaining counts, finding that a question of material fact exists as to whether an exception to the general rule of patent preemption should apply.

It is so ORDERED.